Filed 5/30/25

# CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION ONE

| | |
|---|---|
| STOP C-19, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>TOOLING EXPRESS, INC., et al.,<br><br>    Defendants and Respondents. | B333153<br><br><br>(Los Angeles County<br>Super. Ct. No. 21LBCV00320) |
| AOK TOOLING LIMITED,<br><br>    Plaintiff, Cross-defendant and<br>    Respondent,<br><br>    v.<br><br>STOP C-19, LLC,<br><br>    Defendant, Cross-complainant<br>    and Appellant. | B335674<br><br><br>(Los Angeles County<br>Super. Ct. No. 21STCV23918) |

---

        * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication except for Discussion, part B.

APPEALS from judgments of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge. Appeal No. B333153 affirmed. Appeal No. B335674 reversed and remanded with directions.

Law Offices of Steven P. Scandura and Steven P. Scandura for Plaintiff, Cross-complainant, Defendant, and Appellant Stop C-19, LLC.

Troutman Pepper Locke LLP, Peter N. Villar, Bryan N. Sonksen, and Elizabeth Holt Andrews for Defendants and Respondents Tooling Express, Inc. et al., and Plaintiff, Cross-defendant, and Respondent AOK Tooling Limited.

———————————

Courts and commentators have long cautioned that an order vacating a judgment pursuant to Code of Civil Procedure[1] section 663 must also order the entry of new and different judgment, and that the failure to do so renders the order vacating the original judgment void. (See, e.g., Fairbank et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2020) ¶ 18:499 [collecting cases].) Respondent AOK Tooling Limited (AOK) contends that a 2012 amendment to section 663a, subdivision (b) changed this venerable rule. It did not. The rule remains the same.

As amended, section 663a, subdivision (b) requires courts to determine a section 663 motion within a certain time, currently set at 75 days; the court loses jurisdiction to rule on such a motion once that time expires. Subdivision (b) also states, "A

_____

[1] Unspecified statutory references are to the Code of Civil Procedure.

2

motion to set aside and vacate a judgment is not determined within the meaning of this section until an order ruling on the motion is entered in the permanent minutes of the court, or signed by the judge and filed with the clerk." (§ 663a, subd. (b).) AOK asserts this language means a court has complied with the 75-day time limit for determining a section 663 motion where the court vacates a judgment within 75 days but does not order the entry of a new and different judgment until after the 75-day period has expired.

We disagree. Despite this amendment, a court granting a section 663 motion to vacate a judgment still must order at the same time the entry of a new and different judgment, and the order including *both* must be made before expiration of the 75-day time limit set forth in section 663a, subdivision (b). In the published portion of our opinion, we explain how that did not happen here and why we reverse the court's order vacating a judgment on a claim for unjust enrichment in favor of Stop C-19, LLC (Stop). In the unpublished portion, we affirm the trial court's otherwise faultless navigation of the many complicated issues litigated at a bench trial, and reject Stop's arguments that the court erred in ruling against Stop on certain of its affirmative claims for relief.

## FACTUAL AND PROCEDURAL BACKGROUND

These appeals arise out of a contract dispute concerning the manufacture and importation of N95 masks during the COVID-19 pandemic. The contract required AOK (a Chinese manufacturer) to deliver 50 million N95 masks approved by the National Institute for Occupational Safety and Health (NIOSH) to Stop "as soon as possible" and to modify an existing NIOSH-approved model to include Stop's logo on it. Before any masks

arrived in the United States, AOK informed Stop that changing the logo on the masks would require an application to NIOSH and that NIOSH could take as long as two months to approve such an application.

After several batches of masks were shipped to California (where Stop does business) and sold, relations between the parties broke down. AOK claimed Stop breached the contract by refusing to pay money owed and to accept further shipments. Stop had difficulty selling the product, said it could not accept more masks until market conditions improved, and delayed making further payment. AOK then forwarded forthcoming shipments to its United States affiliate, Tooling Express, Inc. (Tooling). After giving Stop a chance to pay for these shipments and accept delivery, an opportunity Stop ignored, Tooling (at AOK's direction) shipped them to Peru. AOK did not apply for NIOSH approval, and NIOSH never approved the masks at issue. U.S. Customs and Border Protection (CBP) seized subsequent shipments for falsely bearing the NIOSH trademark.

Litigation ensued. AOK sued Stop for breach of contract. Stop cross-complained, pursuing claims that AOK unjustly enriched itself by selling infringing and worthless masks and that AOK misrepresented that it had obtained NIOSH approval. Stop separately sued Tooling and individuals associated with it, claiming these defendants stole some of Stop's masks and sold them in Peru. Contrary to its position vis-à-vis AOK that the masks were worthless, Stop claimed the Tooling defendants owed damages because the allegedly stolen masks had a value equivalent to hundreds of thousands of dollars.

The court consolidated the various actions and conducted a bench trial. After hearing the evidence, the court issued a

4

statement of decision agreeing with Stop that AOK delivered nonconforming and therefore worthless product. The court found against AOK on its claim that Stop breached the contract by refusing to pay for and accept the masks. Based on its conclusion that the masks had no value, the court likewise ruled against Stop on its claims against the Tooling defendants for theft and conversion. Finding Stop was not deceived into thinking the rebranded masks were NIOSH-approved because Stop knew NIOSH had not given such approval, the court held against Stop on its claims against AOK for misrepresentation.

The sole cause of action sustained by the court was Stop's claim against AOK for unjust enrichment. On that claim, the court awarded Stop approximately $2.3 million, representing the difference between what Stop paid AOK and AOK's cost of goods sold. The trial court entered judgment on July 25, 2023. Stop served notice of entry of the judgment containing the unjust enrichment award on August 7, 2023.

On August 22, 2023, AOK filed a motion pursuant to section 663 to set aside and vacate the judgment as to the unjust enrichment cause of action and to enter a new and different judgment in AOK's favor. AOK argued unjust enrichment is not a recognized cause of action in California, that the parties' written contract precluded recovery under a "quasi-contract" or "quantum meruit" theory, that Stop neither pled nor established that its legal remedies would be inadequate, and that the award lacked factual support. Stop opposed the motion.

On October 19, 2023, the trial court granted the motion, agreeing with AOK that Stop could not pursue or recover in quasi-contract on an unjust enrichment claim because the parties had an enforceable agreement regarding the subject matter at

5

issue.  The record contains no reporter's transcript for the hearing.  The court's minute order states, "The motion to vacate the judgment as to the . . . cause of action for [u]njust [e]nrichment is GRANTED."  The minute order did not, however, include any order regarding the entry of a new and different judgment.  Instead, it set a future case management conference for November 8, 2023.  Then, at the November 8th case management conference, the court scheduled a future jury trial on the unjust enrichment cause of action and potential new, related claims Stop proposed to file.

On November 11, 2023, AOK applied ex parte for an order for entry of judgment pursuant to section 663.  AOK sought an order "[c]orrecting nunc pro tunc the [c]ourt's prior order dated October 19, 2023 granting AOK's [m]otion to [s]et [a]side and [v]acate [the] judgment . . . , by directing entry of an amended judgment in favor of AOK on Stop[]'s unjust enrichment claim as required by . . . section 663."  (Italics omitted.)  AOK argued that under section 663, "the [c]ourt was required to immediately enter a new judgment in favor of AOK . . . .  Indeed, the law is clear that an order vacating a judgment pursuant to [s]ection 663, but not directing entry of a new judgment is void."

In opposition, Stop argued that the period during which the court could rule on the section 663 motion expired on October 23, 2023, pursuant to the 75-day time limit stated in section 663a, subdivision (b).  Stop further argued that AOK did not demonstrate a valid reason to change the October 19, 2023 minute order nunc pro tunc.

On November 17, 2023, the trial court granted AOK's request for entry of judgment pursuant to section 663.  It "order[ed the] minute order of October 19, 2023 amended nunc

6

pro tunc to add the words:  [¶]  An [a]mended [j]udgment in favor of AOK Tooling as to the [unjust enrichment] cause of action should enter."  The court executed an amended judgment that same day.

## DISCUSSION

### A.    The Order Vacating the Judgment in Stop's Favor on its Unjust Enrichment Claim is Void

#### 1.    *Standard of Review*

Stop is the only party who has appealed.  It first argues we should reinstate the original judgment on the unjust enrichment claim.  Resolving Stop's claim that the trial court erred in vacating the original judgment in Stop's favor requires interpreting the requirements set forth in sections 663 and 663a. We review such questions of statutory interpretation de novo. (*Reynosa v. Superior Court* (2024) 101 Cal.App.5th 967, 983).

#### 2.    *General Legal Principles and Legislative History*

As relevant here, section 663 permits a court to set aside and vacate a judgment following a bench trial and enter "another and different judgment" due to an "[i]ncorrect or erroneous legal basis for the decision, not consistent with or not supported by the facts."  (*Id.*, subd. (1).)  "[I]n such case when the judgment is set aside, the statement of decision shall be amended and corrected." (*Ibid.*)

Section 663a, subdivision (b) governs when the court must decide the section 663 motion: "Except as otherwise provided in [s]ection 12a,[2] the power of the court to rule on a motion to set

---

[2] Section 12a concerns the computation of time when the last day of a statutory time period falls on a weekend or holiday.

7

aside and vacate a judgment shall expire 75 days from the mailing of notice of entry of judgment by the clerk of the court . . . , or 75 days after service upon the moving party by any party of written notice of entry of the judgment, whichever is earlier, or if that notice has not been given, 75 days after the filing of the first notice of intention to move to set aside and vacate the judgment. . . ." (§ 663a, subd. (b).)

Section 663a, subdivision (b) further provides, "If that motion is not determined within the 75-day period, or within that period as extended,[3] the effect shall be a denial of the motion without further order of the court. A motion to set aside and vacate a judgment is not determined within the meaning of this section until an order ruling on the motion is entered in the permanent minutes of the court, or signed by the judge and filed with the clerk. The entry of an order to set aside and vacate the judgment in the permanent minutes of the court shall constitute a determination of the motion even though that minute order, as entered, expressly directs that a written order be prepared, signed, and filed. The minute entry shall, in all cases, show the date on which the order is entered in the permanent minutes, but failure to comply with this direction shall not impair the validity or effectiveness of the order." "A trial court acts *outside its jurisdiction* if it rules on a [section 663] motion to vacate a judgment after" this 75-day window. (Fairbank et al., Cal.

---

[3] "[T]he phrase 'within that period, as extended' refers only to the extended period when the [last day in the period] falls on a court holiday." (*Garibotti v. Hinkle* (2015) 243 Cal.App.4th 470, 480.)

8

Practice Guide: Civil Trials and Evidence, *supra*, at ¶ 18:498:10 [collecting cases].)

Sections 663 and 663a were enacted in 1897.  Since that time, each version of section 663 has been substantively identical.  Each permitted a court to set aside and vacate a judgment and enter "another and different judgment" due to incorrect legal conclusions that were inconsistent with or not supported by the facts.  (Stats. 1897, ch. 67, § 1, p. 58; Stats. 1933, ch. 744, § 120, p. 1881; Stats. 1981, ch. 900, § 5, p. 3426.)

Courts have long interpreted section 663 to require that when a court grants a motion to set aside and vacate the judgment, it must contemporaneously enter a new judgment.  (*Prothero v. Superior Court* (1925) 196 Cal. 439, 442; *20th Century Ins. Co. v. Superior Court* (2001) 90 Cal.App.4th 1247, 1260; *Ramirez v. Moran* (1988) 201 Cal.App.3d 431, 435; *Dolan v. Superior Court* (1920) 47 Cal.App. 235, 240-241.)  An order of vacation, without directing entry of a new judgment, is void.  (*Prothero*, *supra*, at p. 442; *Ramirez*, *supra*, at p. 435.)  This interpretation makes sense as a court's decision to grant the motion does not depend on any further trial of the facts or presentation of evidence.  " '[A] motion to vacate lies only where a "different judgment" is compelled by the facts found. . . .' [Citation.]  'In ruling on a motion to vacate the judgment the court cannot " 'in any way change any finding of fact.' " ' [Citation.]"  (*Garibotti v. Hinkle*, *supra*, 243 Cal.App.4th at p. 478.)

As *Dolan* explained over 100 years ago, "The code sections do not permit two motions to be made, nor two orders, one setting aside the judgment and another at a later day directing the entry of a different judgment.  If on the motion it appears to the court

9

that the findings require the judgment to be set aside, it must also appear what conclusions of law should be made on the facts, and the only order within the power of the court under these circumstances is one setting aside the judgment and directing as a part of the same order the entry of another judgment. It is from such an order only that an appeal is provided. An order merely setting aside the judgment and leaving the case undetermined is void and not merely erroneous. Any other rule might lead to interminable delays and the loss of important rights by litigants. On such a motion the court has no power to consider or determine any matter except what judgment should be entered upon the facts as found." (*Dolan v. Superior Court*, *supra*, 47 Cal.App. at p. 241; see also *Prothero v. Superior Court*, *supra*, 196 Cal. at p. 443 [When the trial court grants a motion to vacate but does not enter judgment, "the motion to set aside and vacate the judgment and enter another and different judgment is still pending and undetermined. Until that motion is properly disposed of the action of the court thereon as contemplated by the statute has not taken place"].)

The version of section 663a enacted in 1897 (former § 663 ½) set time limits on when the moving party had to make the motion but included no requirement as to when the court had to rule on the motion. Despite numerous amendments, it was not until 2012 that the Legislature codified any such requirement. (See Stats. 2012, ch. 83, § 2; Stats. 1983, ch. 302, § 1, pp. 884-885; Stats. 1967, ch. 169, § 2, p. 1266; Stats. 1967, ch. 119, § 1, p. 1041; Stats. 1965, ch. 1890, § 2, p. 4360; Stats. 1959, ch. 469, § 2, p. 2404; Stats. 1915, ch. 108, § 1, p. 203; Stats. 1907, ch. 380, § 4, p. 719; Stats. 1897, ch. 67, § 1, p. 59.)

10

In 2012, the Legislature enacted Assembly Bill No. 2106 (2011-2012 Reg. Sess.) (Assembly Bill 2106), which amended section 663a to include a time limit (then, 60 days) by which the court had to rule on the motion to vacate, and which described when a motion to vacate has been "determined." (Stats. 2012, ch. 83, § 2.) In 2018, the Legislature extended the time within which the court had to rule on the motion to 75 days. (Stats. 2018, ch. 317, § 2.)

The Senate and Assembly committee reports analyzing Assembly Bill 2106 "uniformly declare [that] the Legislature's intent . . . was to make the period for ruling on a motion to vacate identical to the period for ruling on a new trial motion." (*Garibotti v. Hinkle*, *supra*, 243 Cal.App.4th at pp. 478-479, citing Assem. Com. on Judiciary, Proposed Consent of Assem. Bill No. 2106 (2011-2012 Reg. Sess.) as introduced Feb. 23, 2012, p. 1; Sen. Judiciary Com., Analysis of Assem. Bill No. 2106 (2011-2012 Reg. Sess.) as amended May 24, 2012, p. 5; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2106 (2011-2012 Reg. Sess.) as amended June 18, 2012; Conc. Sen. Amends. to Assem. Bill No. 2106 (2011-2012 Reg. Sess.) as amended June 18, 2012.)[4] The Legislature understood that "courts have generally assumed, given the parallel structure of [sections 660 concerning new trial motions and 663a], that courts are also expected to rule on a motion to set aside and vacate a judgment within the same 60-day period for ruling on a motion

---

[4] On our own motion, we judicially notice these legislative history materials. (*Gananian v. Wagstaffe* (2011) 199 Cal.App.4th 1532, 1541, fn. 9; see also Evid. Code, §§ 452, subd. (c), 459, subd. (a).)

11

for a new trial." (Assem. Com. on Judiciary, Proposed Consent of Assem. Bill No. 2106, *supra*, as introduced Feb. 23, 2012, pp. 2-3.) Assembly Bill 2106 sought to codify that practice.

Although Assembly Bill 2106 was mainly meant to clarify existing law, the committee reports recognized " 'more than symmetry is involved. The lack of direction and limitation invites different hearing times; the prospect of effectively rearguing in this motion the very issues already decided at a prior hearing on the motion(s) for new trial and [judgment notwithstanding the verdict] (conceivably with a different result); and further extending, if not creating confusion concerning, the time to appeal. Moreover, the absence of a specified ruling deadline on a timely noticed section 663 motion could even arguably allow the judge to vacate judgment and enter a new one at any time, especially if no appeal is ever filed divesting the trial court of jurisdiction.' " (Assem. Com. on Judiciary, Proposed Consent of Assem. Bill No. 2106, *supra*, as introduced Feb. 23, 2012, p. 3; see Sen. Judiciary Com., Analysis of Assem. Bill No. 2106, *supra*, as amended May 24, 2012, pp. 3-4; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2106, *supra*, as amended June 18, 2012, p. 4; Conc. Sen. Amends. to Assem. Bill No. 2106, *supra*, as amended June 18, 2012, p. 3.)

3.  *The Trial Court Did Not Comply with Sections 663 and 663a*

Reversing course from its position before the trial court, AOK now argues section 663a requires only that the trial court rule on the motion within the 75-day period and permits a court that grants such a motion to enter an amended judgment after that period has expired. AOK points to the statutory language stating, "A motion to set aside and vacate a judgment is not

12

determined within the meaning of this section until an order ruling on the motion is entered in the permanent minutes of the court, or signed by the judge and filed with the clerk." (§ 663a, subd. (b).) AOK argues based on this language that the court complied fully with section 663a, subdivision (b) on October 19, 2023, because it ruled on the section 663 motion when it entered its order granting the motion in the permanent minutes of the court.

"Our primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent. [Citation.] ' " 'Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible.' [Citation.] Interpretations that lead to absurd results or render words surplusage are to be avoided. [Citation.]" [Citation.]' [Citation.]" (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.) " 'When the language of a statute is ambiguous—that is, when the words of the statute are susceptible to more than one reasonable meaning, given their usual and ordinary meaning and considered in the context of the statute as a whole—we consult other indicia of the Legislature's intent, including such extrinsic aids as legislative history and public policy. . . . [Citation.]' [¶] 'In addition to these general precepts, a more specific principle is directly applicable when . . . the Legislature undertakes to amend a statute which has been the subject of judicial construction. In such a case it is presumed that the Legislature was fully cognizant of such construction . . . .' [Citation.]" (*Make UC a Good Neighbor v. Regents of University of California* (2024) 16 Cal.5th 43, 55.)

Read in isolation, section 663a, subdivision (b) is arguably susceptible to AOK's interpretation.  But we do not read statutory provisions in isolation.  Instead, we construe them with reference to the system of law of which they are a part to harmonize and give effect to the entire legislative purpose.  (*Make UC a Good Neighbor v. Regents of University of California*, *supra*, 16 Cal.5th at p. 55.)  Interpreting section 663a, subdivision (b)'s sentence stating "[a] motion to set aside and vacate a judgment is not determined within the meaning of this section until an order ruling on the motion is entered in the permanent minutes of the court, or signed by the judge and filed with the clerk" to allow the court to enter a new and different judgment after the 75-day period fails to give effect to other statutory language, namely section 663's requirement that granting a motion to vacate requires the simultaneous entry of another and different judgment, and section 663a, subdivision (b)'s language indicating "the power of the court to rule on a motion to . . . vacate . . . shall expire 75 days from the mailing of notice of entry of judgment."  Read as a whole, the statutory language indicates a trial court lacks authority to take further action on a section 663 motion, including the requirement of entering a new and different judgment if it grants such a motion, after the 75 days have expired.

One cannot square AOK's interpretation with the wealth of precedent interpreting section 663 to require entry of a new judgment contemporaneously with granting a motion to vacate the old judgment—judicial interpretations of which we presume the Legislature was aware, and which later amendments did not alter.  (*People v. Garcia* (2006) 39 Cal.4th 1070, 1087-1088 [" '[W]hen, as here, the Legislature undertakes to amend a

14

statute which has been the subject of judicial construction' 'it is presumed that the Legislature was fully cognizant of such construction' "].)  Further, a clear legislative purpose of Assembly Bill 2106 was to address the concern that "the absence of a specified ruling deadline on a timely noticed section 663 motion could . . . arguably allow the judge to vacate judgment and enter a new one at any time."  (Assem. Com. on Judiciary, Proposed Consent of Assem. Bill No. 2106, *supra,* as introduced Feb. 23, 2012, p. 3; see Sen. Judiciary Com., Analysis of Assem. Bill No. 2106, *supra,* as amended May 24, 2012, p. 4; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2106, *supra,* as amended June 18, 2012, p. 4; Conc. Sen. Amends. to Assem. Bill No. 2106, *supra,* as amended June 18, 2012, p. 3.)  However, entering a new judgment at any time is precisely what AOK contends the court can do.

Given the above, it is untenable to read section 663a, subdivision (b) as allowing the court to enter a new and different judgment after the 75-day period concludes.  Trial courts have a duty under section 663 to enter a new or amended judgment contemporaneously when granting a motion to vacate and set aside the judgment.  Otherwise, the trial court's order vacating the original judgment is void.  (*Prothero v. Superior Court, supra,* 196 Cal. at p. 442; *Ramirez v. Moran, supra,* 201 Cal.App.3d at p. 435.)  Courts also have a duty under section 663a, subdivision (b) to rule on a motion to set aside and vacate a judgment within the specified 75-day period.  Thus, a trial court granting a section 663 motion must necessarily also enter a new or amended judgment within the 75-day period specified in subdivision (b) of section 663a.  That did not occur here, meaning the trial court's order vacating the original judgment is void.

15

### 4.    *The Nunc Pro Tunc Order Was Invalid*

AOK argues in the alternative that the trial court timely ordered entry of a new judgment because it directed the new judgment be entered as of October 19, 2023, nunc pro tunc, and October 19 was within the 75-day time limit.  But a nunc pro tunc order permits a court to correct a clerical, as opposed to judicial, error.  (*Estate of Eckstrom* (1960) 54 Cal.2d 540, 544.)  " 'The function of a nunc pro tunc order is merely to correct the record of the judgment and not to alter the judgment actually rendered—not to make an order now for then, but to enter now for then an order previously made.' "  (*Ibid.*, italics omitted.)

Accordingly, " '[t]he question presented to the court on a hearing of a motion for a nunc pro tunc order is: What order was in fact made at the time by the trial judge?' "  (*Estate of Eckstrom*, *supra*, 54 Cal.2d at p. 544, italics omitted.)  Here, on October 19, 2023, the trial court did not enter a new judgment on Stop's unjust enrichment cause of action or even intend to do so.  Instead, the court established a schedule to set the matter for a new trial, the outcome of which was unknown.  Re-dating an order made at a later time to an earlier date is not a proper use of a nunc pro tunc order.  The time limit in section 663a, subdivision (b) is jurisdictional, and "a trial court lacks authority to extend [that] time limit" " 'by means of a nunc pro tunc order.' "  (*Garibotti v. Hinkle*, *supra*, 243 Cal.App.4th at p. 480.)  Thus, the nunc pro tunc order did not make entry of a new judgment in AOK's favor timely.

This does not mean that AOK now lacks any potential remedy for the alleged infirmities with the judgment in Stop's favor on the unjust enrichment claim.  Should AOK have meritorious appellate arguments, it may appeal from the original

16

judgment once the trial court reinstates it upon remand.  (*Matera v. McLeod* (2006) 145 Cal.App.4th 44, 58.)

**B.      The Evidence Does Not Compel a Ruling in Stop's Favor on its Causes of Action**

Stop also appeals the trial court's findings that AOK was not liable on Stop's causes of action for intentional and negligent misrepresentation, and that the Tooling defendants were not liable on Stop's claims for trafficking stolen property and conversion against them.[5]  The court found Stop did not carry its burden of proof on its causes of action for intentional and negligent misrepresentation, and the record evidence does not compel a finding in Stop's favor as a matter of law on those claims.  Stop has failed to provide a fair recitation of the relevant evidence regarding its trafficking and conversion claims against the Tooling defendants and has therefore forfeited its substantial evidence challenge to those causes of action.

---

[5] At oral argument, Stop asserted for the first time that if this court concluded the amended judgment against AOK was void, Stop's appeal of its misrepresentation claims was premature.  Having failed to make this argument in its briefs, Stop has forfeited it.  (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 228.)  Deciding the issue now does not prejudice Stop, nor would it be an efficient use of judicial resources to delay review.  The amended judgment did not change the court's original judgment as to Stop's misrepresentation claims, and, therefore, the reinstated judgment would be the same.  Both parties fully briefed the issues, and if Stop appealed its misrepresentation claims again, it would again bear the burden on appeal to demonstrate error.

17

1.   *Standard of Review*

We review the court's factual findings, including competing inferences drawn from undisputed facts, for substantial evidence. (*Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.* (2012) 204 Cal.App.4th 1214, 1222.) "Under th[e substantial evidence] standard, 'when the trier of fact has expressly or implicitly concluded the party with the burden of proof did not carry the burden and that party appeals, . . . " 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " ' " (*Garcia v. KND Development 52, LLC* (2020) 58 Cal.App.5th 736, 744.) "This is 'an onerous standard' [citation] and one that is 'almost impossible' for a losing plaintiff to meet, because unless the trier of fact made specific factual findings in favor of the losing plaintiff, we presume the trier of fact concluded that '[the] plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof.' [Citation.]" (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651.)

Stop argues that the facts are undisputed and that we should review Stop's misrepresentation, trafficking, and conversion causes of action de novo. The trial court did not say the facts were undisputed; it said they were "largely undisputed," and indeed, some material facts were disputed. Even for the facts that were undisputed, disputes exist over the inferences to be drawn from those facts. Accordingly, a de novo standard of review does not apply.

2.   *Factual Summary Relevant to the Claims at Issue*

(a)   The Parties

Stop, whose principal place of business is Los Angeles, California, is co-owned by John Baron Wong and Gredale, LLC (Gredale). A man named Greg Lorber owns Gredale.

18

AOK, owned by Jerry Mei Sheng Teng (Teng), is a Chinese manufacturer of personal protective equipment including NIOSH-approved N95 masks. Tooling (also owned by Teng) is AOK's affiliate and has a warehouse in Southern California. Stop claims that Chyi Gary Chen was Tooling's chief executive officer and offered evidence in support of that contention. However, Chen testified that he was AOK's director of operations and only helped Tooling upon AOK's request. We refer to Tooling, Teng, and Chen collectively as the Tooling defendants.

      (b)    The Contract

On November 10, 2020, AOK and Stop entered into a contract for Stop to purchase 50 million masks from AOK at the price of $1.10 per mask, or $55 million total. The parties agreed AOK would deliver the masks in batches, with Stop issuing monthly purchase orders. AOK "guarantee[d] [it would] perform the contract as soon as possible in strict accordance with [Stop's] delivery schedule,[6] which [could] be delivered earlier than the planned or incremental delivery, and not less than the promised delivery quantity of 50 million masks."

Under the contract, Stop or its "entrust[ed] logistics company" would "pick up the goods" from AOK in China.[7] Stop

---

**6** The delivery schedule stated that the first batch would be for 1.92 million masks and that "the second batch shall be calculated from the time after the first batch is confirmed by [Stop]."

**7** Relying on trial exhibit 23, Stop argues that the shipping terms were "CIF." As neither party moved that exhibit into evidence, we do not consider it.

19

was to pay for each batch of goods within two days of receiving AOK's notice of delivery.

The contract required Stop to pay a 30 percent deposit of $633,600 for the first batch when it signed the contract. Stop was to pay the remaining 70 percent when it took "delivery of the goods, and then [Stop] [could] take the goods away or entrust [AOK] to transport the goods, and so on to deliver the second batch and third batch. The last batch shall be deducted from the balance of the advance payment. If it is insufficient, [Stop] shall take delivery of the goods after the completion of [AOK] and [Stop]'s performance of the contract." Stop "guarantee[d] [it would] pay the advance payment and payment [terms] in accordance with the schedule issued by [Stop], and [AOK] shall purchase materials for [Stop]'s customized products." If Stop "stop[ped] the order without reason, the received deposit w[ould] not be returned."

The masks were a cup-design model (No. 20180021-L) that NIOSH had already approved. Article 1, section 4 of the contract required AOK to print Stop's logo on the mask and packaging. At trial, Wong testified this contractual section "indicate[d] that AOK would need to obtain approval to place Stop C-19's logo on the respirators" and that AOK was to obtain such NIOSH approval prior to production. The NIOSH-approved model had the brand name "M.Mask" printed on the mask. Post-contract emails suggest that Stop also requested that AOK remove this "M.Mask" printing.

The contract permitted post-contract negotiations to effectuate its purpose. It stated, "During the execution period of the contract, both parties shall not change or terminate the contract at will. If there are any matters not covered in the

20

contract, both parties shall negotiate together to make supplementary provisions, which have the same effect as this contract."

On November 12, 2020, Wong provided his signature to the contract by email to AOK manager Dai Jianguo (Dai). Wong asked, "Can you start production at once and complete 50[ million] masks in the shortest time? When?" The next day, Gredale paid the $633,600 deposit on behalf of Stop, and Wong emailed Dai, "[H]ow many containers will be ready next week?"

(c)   Ren Feng's Involvement

According to AOK, Ren Feng (also known as Zhang Wei) negotiated the contract on behalf of Stop and acted as Stop's agent throughout the parties' dealings. Ren was not Stop's employee, and at trial Stop disputed that Ren was its agent. However, Wong conceded that Ren acted as a Chinese intermediary for him in prior business dealings and that the original contract between Stop and AOK listed Ren as Stop's signatory. Lorber testified that Wong "used Ren as a conduit to communicate with AOK."

Wong acknowledged that Ren expected a commission from Stop in connection with negotiating the contract with AOK. In a December 29, 2020 email, Stop's chief operating officer, Lee Hirsch, informed Wong and Lorber that Stop owed money, including commissions to Ren. Wong responded that Stop would honor its commitments "to agent[s] and sales rep[resentative]s. [¶] . . . [¶] You both agreed if Ren can reduce the cost to $1.10[,] then [Stop] will pay him an agent fee of $[0].10 per mask after the vessel departed."

21

(d)   First Email to Wong About NIOSH Approval
and Changing the Mask's Logo

On November 18, 2020, a Tooling employee sent an email to a NIOSH representative asking about removing the phrase "M.Mask" from the mask.  NIOSH responded, "Your mask label has the M. Mask documented as such with NIOSH.  If you want to change it, that would require an extension of approval to remove it."

On November 18 or 19, 2020, Dai forwarded the email from NIOSH to Wong and stated, "Regarding the change of the logo, [NIOSH] replied that the change requires an application to change the information.  It is estimated that it will take two months to change it, so other parts cannot be deleted within a period of time."  Wong asked Dai to apply for the change and stated, "Looking forward to your [c]ontainers."

Wong testified both that he did not remember receiving this email and that he understood it to mean that AOK had obtained approval from NIOSH to include Stop's logo but had not yet obtained approval to remove the "M.Mask" printing.

(e)   Stop's Initial Orders

On November 25, 2020, Stop paid AOK $1,056,000 for 960,000 masks and $1,193,280 for 1,084,800 masks.  On November 29, 2020, AOK invoiced Stop for $1,452,000 for 1,320,000 more masks; Stop paid this invoice on December 7, 2020.  The masks arrived in Los Angeles in 13 containers.  Due to port congestion, Stop did not receive the first of these containers until on or about December 30, 2020.

On January 18, 2021, Wong emailed AOK that, "I have sold most of the delive[re]d [three] containers, waiting for delivery of the balance of 10 containers to resume removing the small paper.

22

[¶] Customer response has been very positive." Wong testified that "small paper" referred to a packaging insert that indicated the masks as nonmedical, an issue we discuss further below.

### (f)   Second Email to Wong About NIOSH Approval for the Mask's Logo

Before any masks arrived in the United States, on November 26, 2020, Ren sent an email to Wong with a subject line "About changing the [logo]." Ren stated, "AOK has already submitted the information on November 24, and arranged two professional engineers to follow up the change of our [logo]. Attached is internal mail progress tracking." The internal tracking summary stated, "NIOSH has approved the [m]ask 20180021-L[.] Our customer require[s] us [to] delet[e] the M. Mask[ and] add 'Stop C-19.['] Now we need to revise on our approved documents 20180021-L, [a]nd make a new application[.] Pl[ease] try your best to finish before 24th, Nov[ember]." On November 30, 2020, Wong replied, "Ren, [¶] Now Nov[ember] 24 has passe[d][,] did NOISH delete[] the M. Mask and add[] 'Stop C-19'?"

Despite the language in Ren's email and Wong's response, at trial Wong denied that at the time he received Ren's November 26th email Wong knew NIOSH had not yet approved adding Stop's logo to the masks. Wong claimed to believe the NIOSH approval was delayed two months only as to the removal of "M.Mask." Wong said he first learned that NIOSH had not approved the masks with Stop's logo when CBP seized five containers of masks for failing to have NIOSH approval, which Wong identified as occurring in March 2021. Wong claimed that if he had known adding Stop's logo would have caused the masks not to be NIOSH-approved, he would not have entered into the

23

contract. He further asserted he would not have accepted the masks if he knew they had not been approved.

Lorber testified that the masks arrived in boxes stamped NIOSH, which he understood meant they were NIOSH-approved. Like Wong, Lorber asserted he did not learn until later that there was an issue with NIOSH approval. On August 6, 2021, AOK requested that Stop assist AOK in asking CBP to release the seized containers. Lorber said that communication caused him to discover that the masks with Stop's logo were not NIOSH-approved. Lorber claimed that had he known they were not NIOSH-approved, he would not have accepted the masks.

However, also according to Lorber, Stop continued to market, advertise, and sell the masks after learning they were not NIOSH-approved because he was "not aware . . . [of] the nuances of private labeling versus a NIOSH regulatory refusal." Six months prior to trial (or approximately March 2022), Stop sold roughly 50,000 masks to a school district. Lorber claimed that in August 2022 he came to understand that it was illegal to sell the masks and Stop ceased selling them.

### (g) Containers Shipped Under a Special Agreement

Lorber testified Stop received the first 13 containers under the contract "and then there was an additional four containers that went with [a] special agreement."[8] At trial, the parties disagreed about the terms of this special agreement, including when Stop had to pay for the four containers and whether AOK

---

[8] Other witnesses referred to this agreement as a "special arrangement." For the sake of consistency, we use "special agreement" throughout.

24

would release any of the four containers if Stop did not pay for all four of them.

On January 6 or 7, 2021, Dai invoiced Stop for $580,800 for 528,000 masks and requested "payment as soon as possible." Wong forwarded the invoice to Lorber and Hirsch and explained, "This is the smallest order to keep us in good standing with AOK."

On January 8, 2021, Dai emailed Wong, "[Stop is to w]ire payment for [two] containers and AOK will cooperate by shipping [four] containers[.] [Stop will] pay for two more containers then AOK will release the [bill of lading]." Wong thanked Dai for his cooperation.

On January 11, 2021, Stop paid $580,000 for two containers of masks. Wong forwarded proof of payment to Dai and stated, "I look forward to the next four containers."

On January 16, 2021, Ren messaged someone named Huang Zhicheng that, "First, the U.S. side has paid for two containers, while there are a total of four containers. Payment for the remaining two containers needs to be made before they arrive at the U.S. port. If not, the two containers that they already paid for will not be discharged. All the expenses arising from any delay at the port will be borne by the U.S. company. [¶] Second, four containers are expected to be delivered next week, four more the week after that, and five the third week. [¶] As for the payment time, payment for four containers is expected by Thursday U.S. time, payment for six containers by the following Thursday, and payment for five containers by the third Thursday."

In a January 16, 2021 email with the subject line, "About [Stop]'s Delivery Schedule by Year End," sender "Mr. Zhang,

25

STOP C-19" advised AOK of Stop's "reply to [AOK's] inquiry about the delivery schedule of the U.S. company Stop by year end." The email thereafter recounted the substance of the message from Ren to Zhicheng.

A bill of lading identifying AOK as the shipper and Stop as the consignee indicates that two containers, EITU1237768 (EITU) and TGBU6283937 (TGBU), with a total of 2200 cartons of masks were placed aboard a cargo ship on January 22, 2021. These containers held the masks for which Stop had paid $580,000.

On February 7, 2021, AOK emailed Wong, "Recently, in order to meet the needs of your company, we first arranged shipment, but your company has been unable to pay for the goods. According to the contract, it is 'payment before shipment.'" AOK explained seven containers had been shipped and that if it did not receive immediate payment for the five unpaid-for containers, it would offer the seven containers for sale to someone else.

Wong responded that he only authorized two containers "[s]cheduled to arrive [on] February 17, waiting for arrival no rush to make payment. I have not authorize[d] any more containers to be ship[ped] until the U[.]S[.] market respond[s] to the lower [Stop] price of $1.45 [per mask] to compete with 3M['s] $1.70 [per mask price]. [¶] $1.45 is lower than [Stop's] cost[.] Your [freight on board] [of] $1.10 is too high to compete in the U[.]S[.] market. [D]o you have a suggestion?" The following day, Wong added in an email to AOK, "[P]lease show proof that I authorized AOK to ship five more containers."

At trial, Wong testified that after Stop dropped its per mask sale price to $1.45, it no longer made a profit. He

26

nevertheless denied that changing market conditions prevented Stop from selling its inventory.

On February 9, 2021, AOK's freight forwarder emailed Wong that "these four containers will be shipped to the below warehouse." Wong testified that the address given was Tooling's warehouse, although he did not see that the shipments would be sent there when he received the email. When asked whether Wong made any effort to recover the two containers, Wong responded that he did not handle operations, and someone else would have dealt with the issue.

Stop claims that the Tooling defendants stole containers EITU and TGBU using a fraudulent bill of lading. The allegedly fraudulent document identifies AOK as the shipper, Tooling as the consignee, and that the goods were placed aboard the cargo ship on January 22, 2021. It also bears a telex release stamp. At trial, Stop's customs broker and shipping expert, Sheri Lynne Breit, acknowledged that a freight forwarder (which issues bills of lading upon the shipper's—here AOK's—instruction) could change the consignee on the bill of lading if the shipper so directed. She explained that the telex release authorized the goods to be released to another consignee—i.e., Tooling.

A CBP entry summary form for 528,000 face masks indicates the goods entered a United States port on February 12, 2021, and lists the "[e]ntered [v]alue" of the goods as $353,760. Chen testified this value reflected AOK's cost to make the masks.

Containers EITU and TGBU arrived in the port of Los Angeles on February 16, 2021, and were hauled away on February 22, 2021. The containers were dropped off at Tooling's warehouse on March 2, 2021. There is no evidence that Stop made any effort to take delivery of these masks.

27

The two unpaid-for containers were loaded onto a vessel in China on February 21, 2021. At trial, Wong testified that he never agreed that the four containers would be released to Stop only after Stop paid for all four containers. He also testified that Stop's payment for the two unpaid containers was not due until the goods arrived in port. Those containers arrived on March 28, 2021. It is unclear whether Stop received any notice that those containers had arrived. There is no evidence that Stop paid for these containers or attempted to obtain the masks therein at any time.

(h)    Stop Experiences Difficulty Selling the Masks

As mentioned previously, in February 2021, Wong informed AOK that the cost of AOK's masks was too high for Stop to be competitive in the United States market. Further, although Stop had orders for the initial 13 containers of masks it received from AOK, each box of masks contained a slip of paper stating they were "nonmedical."[9] Thus, within a few weeks of receiving the first shipments, Stop received complaints that customers did not want "nonmedical" masks. Lorber clarified that hospitals could use nonmedical NIOSH-approved N95 masks under an emergency use authorization, but he was unable to convince Stop's clients to feel comfortable doing so. Stop's customers returned or rejected the masks, and they remained in Stop's warehouse.

Because of such sales difficulties, Stop did not request additional masks from AOK. According to Lorber, between

---

[9] According to AOK's expert in Chinese trade law, Chinese legislation required the disclaimer that the masks were nonmedical.

28

February 2021 and a few months before trial (which began September 12, 2022), Stop sold only 15 percent of what it received from AOK.

(i)     Chen Visits Stop's Warehouse

On February 25, 2021, Wong met Chen at Stop's warehouse. Wong showed Chen the warehouse was approximately 95 percent full. According to Chen, during the visit Wong said that Stop could not accept additional shipments, that he understood AOK could not release the containers without Stop first paying for them, and that Stop did not want the containers at the time because the warehouse was too full.

On March 1, 2021, Chen emailed Wong that AOK had "several containers on the water which were shipped out in January and February; however, no payment on these containers have been made by Stop," despite Stop's promises on at least four occasions that it would make payment. "[W]e continue[d] to make concessions to allow you to delay payment when you promised to make the payment on or before March 2nd. However, to date, we have not received payment[] . . . ." AOK considered Stop's "continued failure to make the payments" to be a breach of their contract. Chen stated, "If you fail to make the payment on March 2nd . . . , we will have no choice but to sell the inventory to other customers, and Stop . . . will be responsible for all costs associated with such sale, including repackaging, shipping, and any other costs." Wong testified that at the time he received this email, Stop had indicated that it did not want any more N95 masks.

Chen believed that if Stop intended to pay for those containers, Wong would have responded to Chen's email. Wong did not.

Breit testified that documents she reviewed showed that on March 31 and May 7, 2021, Tooling shipped the masks from containers EITU and TGBU to Peru. A bill of lading with Tooling as the shipper and a company in Lima, Peru as the consignee, shows that masks were laden on board in new containers on May 7, 2021. The record lacks a document evidencing the March 31, 2021 shipment. According to Chen, "The intention was to ship the[ masks] to a customer in Peru so that they could sell them."

(j)  AOK Acknowledges It Did Not Apply for NIOSH Approval for the Addition of Stop's Logo

At trial, the parties stipulated that the mask model at issue was NIOSH-approved and certified, but the addition of Stop's logo required an extension of approval that was never obtained. Both Chen and Teng testified that AOK did not apply to NIOSH for approval of masks with Stop's logo. As a result, CBP detained certain containers of masks due to NIOSH trademark violation.

The trial court asked Teng why AOK did not attempt to obtain the required NIOSH approval. He responded that AOK needed documentation from Stop that it did not receive. The court then asked what AOK did to get the process started. Teng testified that he provided the information to Wong and told him the process would take two months.

3.  *Procedural Summary*

(a)  The Claims

On June 10, 2021, Stop sued the Tooling defendants for, among other things, "[t]rafficking in [s]tolen [g]oods" under Penal Code section 496, subdivision (c) and theft and conversion (case

30

No. 21LBCV00320).[10] The complaint alleged that Stop ordered and paid for 528,000 N95 masks from AOK. While the masks were in the Port of Los Angeles, the Tooling defendants caused a new bill of lading to be created in their favor and then sold the goods to another customer. Among other relief, Stop sought treble damages.

On June 28, 2021, AOK filed a complaint against Stop and Wong for, among other things, breach of contract (case No. 21STCV23918). The complaint alleged the parties' contract required Stop to purchase 50 million masks for $55 million. After paying for approximately 3.6 million masks, Stop did not accept any further deliveries. AOK alleged it suffered at least $22 million in lost profits and damages, including the costs of raw materials purchased in reliance of Stop's contractual commitment, storage costs, re-packaging costs, re-exportation costs, and shipping costs.[11]

On September 3, 2021, the trial court related the two matters and set case No. 21LBCV00320 as the lead case.

On September 13, 2021, Stop cross-complained against AOK for, among other claims, intentional misrepresentation, negligent misrepresentation, and unjust enrichment. Stop did not assert claims for breach of contract or breach of the implied warranty of merchantability.

---

[10] Stop also sued AOK Medtech, Inc. (Medtech). On December 7, 2021, the court granted Medtech's motion to quash service of summons and dismissed the case against Medtech.

[11] AOK later amended its complaint to add Gredale, Lorber, and Hirsch as defendants. On September 8, 2022, the trial court dismissed Hirsch without prejudice. Lorber and Gredale were severed from the rest of the action.

### (b)     Trial and Closing Argument

The court conducted a five-day bench trial in September 2022.

During closing argument, Stop argued that stamping NIOSH on the masks and boxes when they were not NIOSH-approved was a misrepresentation. Stop claimed it relied on this misrepresentation because it did not reject the goods as nonconforming when they arrived in port. The trial court indicated it disagreed that the NIOSH marks could be reasonably relied upon as a representation to Stop (as opposed to the public) that the masks were NIOSH-approved given the parties' prior dealings. The court also explained that if AOK had a contractual obligation to produce a legal product, its failure to do so was a breach of contract, not a misrepresentation, and the intent to defraud was missing.

Stop's counsel further argued that the masks were illegal and could not be sold: "The NIOSH mark renders the product illegal. It subjects them to sanctions. It subjects them to being shut down . . . ." When the court observed Stop kept selling the masks after it learned they were not NIOSH-approved, Stop responded that once it understood the legal ramifications of selling non-approved masks it ceased selling them.

As to theft, the court observed that the goods had to belong to Stop before they could be stolen, and if AOK believed there was a legitimate business dispute that all four containers had to be paid for before they were released to Stop, intent could not be proven. The court also asked Stop what value the goods had, noting it understood Stop's position to be that the goods were worthless. Stop responded, "If your honor does not believe the NIOSH violation, then they have value. If your honor does

believe the NIOSH violation, then you're right.  They have zero value."  However, counsel also asserted that the amount Stop paid for the masks ($580,000) or the amount listed on the February 12, 2021 CBP entry summary ($353,760) could represent the fair market value for the 528,000 masks.  Counsel further argued that the CBP entry summary listing Tooling as the "consignee" represented "the moment of theft" by Tooling.  The court observed, however, that Tooling only took the masks to their warehouse, and they were still available for Stop to pick up for some time, until they were shipped to Peru.

During AOK and the Tooling defendants' closing arguments, their counsel argued a theft did not occur and AOK and the Tooling defendants believed they had a right to hold the masks until Stop paid for all four containers.  Further, the testimony established that Stop did not want any more containers beginning in February 2021.

Turning to AOK's breach of contract claim, the court noted Teng's testimony as to why AOK did not apply for NIOSH approval was unclear.  AOK's counsel explained Stop prematurely terminated the contract in February 2021 due to a change in market conditions.  Counsel also argued that Stop bought the initial shipments "knowing that the logo had not been approved."

(c)    The Trial Court's Ruling

On July 20, 2023, the trial court issued a statement of decision.  It stated, "The facts are largely undisputed," and summarized the parties' contract performance.  The court further stated, "The evidence suggests that a weakening market, not the [nonmedical] insert were the causes of the lack of sales.  It is clear from the testimony from Mr. Wong that sales were slow

33

even after they began removing the insert. . . . Wong admits [in an email chain] that the unit price is no longer competitive. Stop . . . also complained that it was not allowed to take possession of the final shipment and that Tooling . . . illegally took possession of the goods. This forms the basis of Stop[]'s trafficking in stolen goods and conversion causes of action. . . . Stop . . . [also] . . . argue[d] that all of the masks that it purchased from AOK were worthless because . . . []NIOSH[] never approved the labeling for the masks or their packaging. Under the law, no mask can be sold without NIOSH approval, rendering the product valueless. . . . Teng, one of the principals of AOK, testified that the contract required AOK to get NIOSH approval, AOK did not get NIOSH approval and AOK did not try to get NIOSH approval. He [*sic*[12]] also testified that his unit cost per mask was $0.67."

As to Stop's complaint against the Tooling defendants, the trial court found in favor of the defendants as to all of Stop's causes of action, including trafficking in stolen goods and conversion. The court stated that it agreed with Stop's position that the goods had no value because it would be illegal to sell them in the United States. Therefore, Stop had no damages.

As to AOK's breach of contract claim against Stop, the trial court ruled in Stop's favor. The court found AOK did not perform under the contract because it "fail[ed] to provide product of any value."

Turning to Stop's cross-complaint against AOK, the trial court found in AOK's favor on Stop's causes of action for

---

[12] This appears to be an error, as it was Chen and not Teng who testified the masks cost approximately $0.67 each to produce.

34

intentional and negligent misrepresentation. The trial court stated that Stop failed to prove "that a misrepresentation was made or relied upon." As previously noted, the trial court found in Stop's favor on its unjust enrichment claim against AOK.

4.   *The Evidence Did Not Require the Court to Rule in Stop's Favor on the Intentional and Negligent Misrepresentation Claims Against AOK*

Stop argues AOK intentionally or negligently misrepresented the masks were NIOSH-approved, and the court erred in concluding otherwise. The elements of a claim for intentional misrepresentation or deceit " 'are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) " 'The elements of a negligent misrepresentation are "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." [Citation.] Negligent misrepresentation does not require knowledge of falsity . . . .' [Citations.]" (*Borman v. Brown* (2021) 59 Cal.App.5th 1048, 1060.)

The court found Stop "failed to prove, to the satisfaction of the court, that a misrepresentation was made or relied upon." We find no error in this determination, as the evidence does not compel a finding in favor of Stop as a matter of law. (*Garcia v. KND Development 52, LLC*, *supra*, 58 Cal.App.5th at p. 744.)

35

Turning first to whether there was a misrepresentation, Stop claims it was undisputed that "AOK represented that the masks were NIOSH certified by printing NIOSH on the masks and then putting them in boxes marked 'NIOSH.' " In support, Stop cites photographs and testimony showing the masks and boxes marked "NIOSH." But the evidence also supported the conclusion that AOK alerted Stop that NIOSH had not approved the change in logo, and that Stop knew NIOSH never gave its approval. If one credits these facts, as the trial court obviously did, Stop was not misled. Accordingly, Stop cannot establish as a matter of law the essential element that AOK intentionally or negligently misrepresented to Stop that the products were NIOSH certified.

Stop's argument regarding reliance fares no better. First, if there was no misrepresentation, there can be no reliance on a misrepresentation. Additionally, evidence was adduced, which the trial court credited, that Stop would have accepted the masks even if they were not yet NIOSH-approved. Stop pressed AOK to ship the masks "in the shortest time." Thereafter, AOK indicated to Stop that the masks were not NIOSH-approved. Despite this, Stop marketed the masks and even sold some to a school district when it knew the masks were not NIOSH-approved. Although Lorber and Wong testified that Stop would have rejected the goods had they known the masks were not NIOSH-approved, the court was entitled to disbelieve this testimony.

5. *Stop Has Forfeited Appellate Review of Its Stolen Goods Claims Against the Tooling Defendants*

Stop lastly claims the trial court erred in finding the Tooling defendants not liable on Stop's claims against them. Stop's first cause of action against the Tooling defendants was for

36

"[t]rafficking in [s]tolen [g]oods" pursuant to Penal Code section 496. Subdivision (a) of Penal Code section 496 states, "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment . . . ." The statute also provides that any person injured by a violation of subdivision (a) may bring an action for three times the amount of actual damages, costs of suit, and reasonable attorney's fees. (Pen. Code, § 496, subd. (c).) Stop's cause of action for conversion required Stop to prove " ' " '(1) [Stop]'s ownership or right to possession of the property; (2) the [Tooling] defendants' conversion by a wrongful act or disposition of property rights; and (3) damages.' " ' [Citation.]" (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240.)

Stop argues that but for the court's allegedly erroneous finding that the masks were valueless, the court would have found in its favor on these claims. But the value of the masks was not the only factual predicate to proving these causes of action, as Stop itself has acknowledged, because Stop's claims also required it to establish that it owned the two containers of masks. Indeed, Stop's opening brief expressly identifies the question of whether it owned the masks at the time of the alleged theft as an issue to be decided in this appeal. Although the trial court's statement of decision is silent as to any non-damage elements, Stop did not request that the court address the ownership issue in its statement of decision. Accordingly, we must infer the court made all factual findings necessary to

support the judgment (meaning here the conclusion that Stop did not own the masks) and consider whether substantial evidence supports those findings. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58-60.)

"In every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment. [Citation.]" (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739; see Cal. Rules of Court, rule 8.204(a)(2)(C).) "If one is going to make a 'the-facts-compel-that-I-win-as-a-matter-of-law' argument, one's brief must fairly state all the evidence." (*McCauley v. Howard Jarvis Taxpayers Assn.* (1998) 68 Cal.App.4th 1255, 1266.) Stop's appellate brief fails to fairly summarize all facts pertinent to these claims in the light most favorable to the judgment. We deem Stop's failure to do so a forfeiture of its substantial evidence challenge. (*People v. Ashford University, LLC* (2024) 100 Cal.App.5th 485, 503.)

Instead of setting forth all the ways in which Stop has skewed the factual summary in its favor, we highlight the most obvious example. Stop omits any reference to the parties' "special agreement," which is key to understanding whether Stop actually owned the masks allegedly stolen from it and whether the Tooling defendants knew the property was stolen. Evidence of that special agreement suggested title to the 528,000 masks allegedly stolen did not pass to Stop given the payment terms and Stop's failure to comply with them. Stop's omission of these facts cannot have been an oversight, because during closing argument the trial court flagged the issue that if the Tooling defendants believed there was an agreement that Stop had to pay

38

for all four containers before any would be released to it, the Tooling defendants were not liable for stealing them.[13]

## DISPOSITION

The judgment in case No. 21LBCV00320 is affirmed.

The November 17, 2023 judgment, entered nunc pro tunc on October 19, 2023, in case No. 21STCV23918 is vacated. On remand, the trial court is directed to reinstate its July 25, 2023 judgment in that case.

All parties are to bear their own costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION

WEINGART, J.

We concur:

BENDIX, Acting P. J.

M. KIM, J.

---

[13] Given the special agreement, even if Stop had not forfeited its substantial evidence argument on the stolen goods claims, the evidence does not compel a ruling in its favor.

39